UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

NANCY G. P.,                          :
                                      :
*Plaintiff*,                          :
                                      :
            v.                        :        No. 3:20-CV-00362-SDV
                                      :
ANDREW M. SAUL,                       :
                                      :
*Commissioner of*                     :
*Social Security*,                    :
                                      :
*Defendant*.                          :
_____X

**RULING ON PENDING MOTIONS**

This is an administrative appeal following the denial of plaintiff, Nancy G. P.'s

application for Title II Disabled Widow Benefits ("DWB") and Title XVI Supplemental Security

Income ("SSI"). It is brought pursuant to 42 U.S.C. § 405(g).[1] Plaintiff now moves for an order

reversing the decision of the commissioner of the Social Security Administration ("the

Commissioner" or "defendant"), or in the alternative, remanding for a new hearing. Doc. No. 18.

The Commissioner, in turn, has filed a motion for an order affirming the decision of the

Commissioner. Doc. No. 21. After careful consideration of the arguments raised by both parties,

and also a thorough review of the administrative record, the Court: 1) **DENIES** plaintiff's

---

[1] Under the Social Security Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. §§ 405(b)(1) and 1383(c)(1)(A). The Commissioner's authority to make such findings and decisions is delegated to administrative law judges ("ALJs"). *See* 20 C.F.R. §§ 404.929; 416.1429. Claimants can, in turn, appeal an ALJ's decision to the Social Security Appeals Council. *See* 20 C.F.R. §§ 404.967; 416.1467. If the Appeals Council declines review or affirms the ALJ opinion, the claimant may appeal to the United States District Court. The Social Security Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C § 405(g).

Motion to Reverse the Decision of the Commissioner (Doc. No. 18); and 2) **GRANTS** defendant's Motion to Affirm the Decision of the Commissioner (Doc. No. 21).

## I.    LEGAL STANDARD

Under the Social Security Act, a widow[2] shall be entitled to widow's insurance benefits if such person "(A) is not married, (B) (i) has attained age 60, or (ii) has attained age 50 but has not attained age 60 and is under a disability." 42 U.S.C. § 402(e)(1). The term "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant will meet this definition if his or her impairments are of such severity that the claimant cannot perform pervious work. 42 U.S.C. § 423(d)(2)(A).

The Commissioner must follow a sequential evaluation process for assessing disability claims.  The five steps of this process are as follows: (1) the Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based solely on the medical evidence, the claimant has an

---

[2] The Social Security Act defines the term "widow" as "the surviving wife of an individual, but only if (A) she is the mother of his son or daughter, (B) she legally adopted his son or daughter while she was married to him and while such son or daughter was under the age of eighteen, (C) he legally adopted her son or daughter while she was married to him and while such son or daughter was under the age of eighteen, (D) she was married to him at the time both of them legally adopted a child under the age of eighteen, (E) except as provided in paragraph (2), she was married to him for a period of not less than nine months immediately prior to the day on which he died, or (F) in the month prior to the month of her marriage to him (i) she was entitled to, or on application therefor and attainment of age 62 in such prior month would have been entitled to, benefits under subsection (b), (e), or (h) of section 402 of this title, (ii) she had attained age eighteen and was entitled to, or on application therefor would have been entitled to, benefits under subsection (d) of such section (subject, however, to section 402(s) of this title), or (iii) she was entitled to, or upon application therefor and attainment of the required age (if any) would have been entitled to, a widow's, child's (after attainment of age 18), or parent's insurance annuity under section 231a of Title 45." 42 U.S.C. § 416(c)(1).

impairment which "meets or equals" an impairment listed in Appendix 1 of the regulations (the Listings); if so, and it meets the durational requirements, the Commissioner will consider the claimant disabled, without considering vocational factors such as age, education, and work experience; (4) if not, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has the residual functional capacity to perform his or her past work; and (5) if the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work in the national economy which the claimant can perform. *See* 20 C.F.R. §§ 404.1520; 416.920. The claimant bears the burden of proof on the first four steps, while the Commissioner bears the burden of proof on the final step. *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Accordingly, the district court may not make a *de novo* determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. *Id*; *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the court's function is to first ascertain whether the Commissioner applied the correct legal principles in reaching her conclusion, and then whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). Therefore, absent legal error, a decision of the Commissioner cannot be set aside if it is supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Williams v. Bowen*, 859

3

F.2d 255, 258 (2d Cir. 1988). It must be "more than a mere scintilla or a touch of proof here and there in the record." *Id.* If the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982).

## I.   PROCEDURAL HISTORY

Plaintiff filed her DWB and SSI application on January 30, 2017. (R. 70, 78). The application alleged a disability onset date of January 30, 2017. (Id.). The claim was denied at the initial and reconsideration levels. (R. 76, 85, 97, 106). Thereafter, plaintiff requested a hearing. (R. 144). On July 25, 2018, a hearing was held before Administrative Law Judge Deirdre R. Horton (hereinafter, "the ALJ"). (R. 54). On that date, the ALJ took the testimony of Vocational Expert John Bopp (hereinafter, "VE"). (R. 56-67). Plaintiff, who was represented by counsel, was unable to testify at the hearing because she is monolingual in Spanish and the Spanish-language interpreter was not available. (R. 56). The ALJ continued plaintiff's hearing to another date. (R. 67). On November 14, 2018, a second hearing took place and plaintiff, who was accompanied by counsel, gave her testimony with the assistance of a Spanish-language interpreter. (R. 37).

On January 17, 2019, the ALJ issued a decision denying plaintiff's claims. (R. 21-31). Plaintiff subsequently requested review of the ALJ's decision by the Appeals Council. (R. 303-306). On January 23, 2020, the Appeals Council denied review, making the ALJ's decision the final determination of the Commissioner. (R. 1). This action followed.

## II.   FACTUAL BACKGROUND

Plaintiff was fifty-nine (59) years old when she testified before the ALJ at the November 14, 2018 hearing. (R. 42). Plaintiff required a Spanish-language interpreter for the hearing as she does not speak English. (R. 56). She was born in Colombia and moved to the United States more

than thirty years prior to the hearing date. (R. 42). In 2016, however, plaintiff lived with her husband in Puerto Rico. (R. 42-43). On one occasion, plaintiff left Puerto Rico to visit her daughter in the United States. (R.43). Plaintiff returned to Puerto Rico in April 2016 where she discovered that her husband had been murdered in their home. (R. 42-43). Plaintiff attributed her mental health issues to her husband's death. (R. 45).

Plaintiff reported suffering from major depressive disorder, chronic anal fissures, and neck pain/muscle spasms. (Doc. Nos. 18-1, 18-2). She has not worked since January 2017. (R. 45). Plaintiff has past work experience as a store's laborer for Stop & Shop, a baker for Stew Leonard's and Whole Foods, a laundry laborer for Norwalk Hospital, a food service worker for a nursing home and a hand packager for Talent Tree Market. (R. 60-61).

Plaintiff described herself as a "very solitary" person who lacks motivation to do activities. (R. 47-49). Plaintiff stated she lives with her son, daughter-in-law and her two grandchildren. (R. 41). She reported having difficulty concentrating while doing household tasks such as cooking and laundry. (R. 46). Plaintiff also indicated that she sometimes needs reminders to maintain her personal hygiene and needs assistance in going out for medical appointments. (R. 48). She stated that she does not drive and relies on her son and daughter-in-law to take her to appointments. (R. 44). Plaintiff also suffered from frequent crying spells. (R. 46).

Plaintiff also reported frequent pain from various physical impairments. (R. 50-51). Plaintiff believed her pain resulted from a surgery on her buttocks. (R. 45). Plaintiff averred that the pain prevents her from sitting for long periods of time. (R. 47). Specifically, she cannot sit for more than fifteen minutes without pain. (R. 50-51). Plaintiff's pain also interferes with her sleep. (R. 51). Plaintiff alleviated the pain by sitting in a warm bath. (R. 51). Plaintiff claimed that her only solution is surgery, which could result in her losing control of her bowel

movements. (R. 50). Plaintiff also testified that if employed, she would miss multiple days of work because of her physical limitations and her difficulty concentrating. (R. 52).

The record suggests that plaintiff traveled during the relevant time period. (R. 43, 507, 510, 532, 542-43). Plaintiff traveled to Canada in December 2017 to visit her daughter. (R. 507, 532). While in Canada, plaintiff visited a walk-in clinic to treat a Urinary Tract Infection. (R. 507). Plaintiff also flew to Colombia in March 2018 to visit her mother. (R. 43, 542-43, 510). During her visit to Colombia, plaintiff visited a walk-in clinic to be treated for laryngitis. (R. 43, 510).

Plaintiff's medical history concerning treatment for her impairments is set forth in Exhibit F. In general, she received treatment for her anal fissures from her primary care physician, Dr. Kathleen Melendez (*See* Exs. 1F, 11F, 12 F, 13F) and, on occasion, she visited a Colorectal Surgery Specialist, Dr. James McClane (*See* Exs. 5F, 11F, 13F). Plaintiff's psychiatrist is Dr. Jose Camacho Pantoja (*See* Exs. 4F, 7F, 10F) and her physical therapist is Allison Schwartz, DPT (*See* Ex. 14F). As a result of the disability application, plaintiff also had a consultative examination with Dr. Jesus Lago (Ex 2F).

## III.   THE ALJ'S DECISION

The ALJ found that plaintiff meets the non-disability requirements for disabled widow's benefits because plaintiff was the unmarried widow of a deceased insured worker and was at least 50 years old. (R. 24). The ALJ then followed the sequential evaluation process to determine whether plaintiff was disabled under the Social Security Act.

At step one, the ALJ found plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of January 30, 2017, through the prescribed period's end date of July 31, 2019. (R. 24). At step two, the ALJ found plaintiff has the following severe impairments: major depressive disorder and complicated bereavement syndrome. (R. 24). At step

three, the ALJ found plaintiff does not have an impairment or combination of impairments that

meets or medically equals the severity of one of the listed impairments. (R. 25). Next, the ALJ

determined plaintiff retains the following residual functional capacity[3]:

> [T]o perform a full range of work at all exertional levels but with the following non-exertional limitations: The claimant is able to perform simple, routine tasks with occasional interaction with coworkers and occasional work with the general public. There should be no work that requires groups or teams but the claimant can do self-paced work.

(R. 26-27).

At step four, the ALJ found plaintiff is "capable of performing past relevant work as a

laundry laborer, a laborer stores [sic], a food service worker and a hand packager." (R. 30).

Specifically, the VE testified that a person with plaintiff's vocational factors and the assessed

RFC can perform all of plaintiff's past relevant work except for the baker position. (R. 30, 61-

62).  Thereafter, the ALJ reasoned that plaintiff's statements on the intensity of her impairments

were not "entirely consistent with the medical evidence and other evidence in the record." (R.

27). The ALJ noted that plaintiff's travel to Canada in 2017 and Colombia in 2018 supported the

notion that plaintiff's condition improved with treatment. (R. 29). The ALJ also referred to

medical notes showing medication and treatment having an overall improvement on plaintiff's

condition. (R. 28).

IV.   **DISCUSSION**

Plaintiff's brief presents three separate issues: (1) whether the ALJ failed to develop the

record; (2) whether the ALJ erred in her evaluation of the evidence; and (3) whether the ALJ

erred by excluding additional limitations from the RFC.  The Court will review each in turn.

---

[3] Residual functional capacity (hereinafter, "RFC") is the most a claimant can do in a work setting despite his or her limitations.  20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1).

a. **The ALJ's Duty to Develop the Record**

Plaintiff appears to suggest that the ALJ's ruling should be reversed because the record was inadequately developed:

> Even if the current objective evidence was not enough for the ALJ to compose an accurate RFC description, then the ALJ should have developed the opinion evidence by obtaining testimony from a medical expert to illuminate how Ms. [G. P.'s] physical impairments affect her "ability to work, or her ability to undertake her activities of everyday life"….Additionally, the medical records on which the ALJ relied in no way "shed any light on [plaintiff's] residual functional capacity."

Doc. No. 18-1, at 8 (citation and quotation marks omitted). Plaintiff contends that the ALJ erred in not obtaining medical expert testimony to determine plaintiff's ability to work or perform daily activities. Doc. No. 18-1. The Court finds that the ALJ properly developed the record since it contains sufficient evidence regarding plaintiff's abilities.

The Court's role in reviewing a disability determination is not to make its own assessment of plaintiff's functional capabilities; it is to review the ALJ's decision for reversible error. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). "It is the rule in our circuit that the ALJ, unlike the judge in a trial, must [her]self affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1997) (internal quotation marks omitted); *see Moreau v. Berryhill*, No. 3:17-CV-396 (JCH), 2018 WL 1316197, at *4 (D. Conn. Mar. 14, 2018) ("An ALJ in a social security benefits hearing has an affirmative obligation to develop the record adequately." (internal quotation marks omitted)).

Remand for further development of the record is not required "where…the record contains sufficient evidence from which an ALJ can assess the petitioner's [RFC]." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013); *see also Janes v. Berryhill*, 710 F. App'x 33, 34 (2d Cir. 2018) ("The ALJ is not required to develop the record any further when the

evidence already presented is 'adequate for [the ALJ] to make a determination as to disability.'" (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996))).

Here, the ALJ appropriately concluded that the record as a whole established a greater level of functioning than alleged. (*See* R. 25-26, 28-29). The record contains a Questionnaire for Daily Activities in which plaintiff, on August 16, 2017, expressed her own capability to engage in daily activities. (R. 384-90). In that questionnaire, plaintiff reported going for walks, cleaning, cooking, doing laundry, ironing, going to church on Sunday and going food shopping (R. 384-388). Plaintiff also reported being able to pay bills, count change, handle a savings account and use a checkbook (Id.). She also noted that she gets along with authority figures "relatively well" and that she can follow written instructions "well." (R. 384-90). By November 9, 2017, plaintiff was "pleasant and reported that she was feeling better" to Dr. Camacho Pantoja, her treating mental health physician, and that she was travelling to Canada to be with her daughter who would be delivering a baby within one week. (R. 532). By February 1, 2018, Dr. Camacho Pantoja noted that plaintiff was "brighter looking, pleasant and productive." (R. 537). He also noted that she reported feeling well except that she was sleeping poorly. (R. 537). By March 1, 2018, Dr. Camacho Pantoja observed that plaintiff was "pleasant and reported that she is sleeping well but [] was waking up with headaches." (R. 542). He also noted that plaintiff planned to go to Colombia to be with her elderly mother. (R. 542). By April 26, 2018, Dr. Camacho Pantoja stated that plaintiff was "pleasant, smiling and bright looking" and had "no complaints except for poor sleep." (R. 548).

The record also contains a Residual Functional Assessment proffered by Dr. Camacho Pantoja, on May 31, 2018. (R. 503-05). Although the assessment contains some contradictions with entries in Dr. Camacho Pantoja's other treatment notes, the assessment still provides insight

into plaintiff's daily activities and ability to work. For example, the assessment indicates that there is no evidence of limitation in plaintiff's ability to "carry out very short and simple instructions[,]" to "sustain an ordinary routine without special supervision" and to "make simple work-related decisions." (R. 503). Dr. Camacho Pantoja also noted that plaintiff was not limited in her ability to "maintain regular attendance," "interact appropriately with the general public" and "accept instructions and respond appropriately." (R. 503). He also found that plaintiff was not significantly limited in her "ability to maintain socially appropriate behavior[,]" "ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes" and in her "ability to be aware of normal hazards and take appropriate precautions." (R. 503).

Also provided in the record is a check-the-box questionnaire, from plaintiff's primary care provider, Dr. Kathleen Melendez. (R. 666-68). Although the ALJ attributed "little weight" to the overall questionnaire, the form does provide Dr. Melendez's opinion on plaintiff's ability to perform activities of daily living, social interactions and individual task performance. (R. 666-68). Dr. Melendez's opinion on this form provides insight into plaintiff's capabilities regarding work and daily activities. For example, Dr. Melendez indicated on this form that plaintiff had a "better than average ability" in "[c]aring for physical needs," "[c]arrying out multi-step instructions" and "[r]especting/responding appropriately to others in authority." (R. 666-67).

Furthermore, the record consists of Dr. Jesus Lago's consultative examination of plaintiff. (R. 447-51). On April 27, 2017, while Dr. Lago noted that plaintiff had become "very depressed" after the death of her husband, he also observed that plaintiff found benefit after taking Prozac and that "there has been some improvement." (R. 449). Dr. Lago stated that she takes care of a 1 ½ year-old grandchild who also goes to a daycare and he reported that plaintiff was "insightful, attentive and focused," that she "followed commands and instructions" and that

10

her cognition was "intact and oriented."  (R. 447-450).  The report details Dr. Lago's observations on plaintiff's daily activities. (*See* R. 450). For example, Dr. Lago stated that "[plaintiff] cooks and cleans at times, but this is when she has some energy…. [Plaintiff] does take care of [activities of daily living]. (R. 450).  He concluded that plaintiff "demonstrated sustained concentration and persistence throughout [the] interview" and that continued anti-depressant therapy treatment should improve her condition. (R. 451).  Ultimately, Dr. Lago opined that plaintiff's "prognosis is good," (R. 451), which is only underscored by the progress plaintiff made in her treatment with Dr. Camacho Pantoja between August 2017 and May 2018 as set forth above.

In short, the ALJ properly relied on the existing medical record from plaintiff's treating providers in determining plaintiff's mental and physical abilities. Accordingly, the ALJ was not required to request additional RFC assessments. *See e.g.*, *Rivera v. Berryhill*, No. 3:16-cv-01842(JAM), 2018 WL 1521824, at *4 (D. Conn. March 28, 2018) ("[T]he Second Circuit has concluded that an ALJ was not under an obligation to further develop the record where the record contained a partially relied-up opinion from a consultative examiner and the treatment notes from the plaintiff's doctor."). Additionally, plaintiff has failed to demonstrate how additional medical opinions would undermine the ALJ's decisions. *See Lena v. Astrue*, No. 3:10-cv-893(SRU), 2012 WL 171305, at *9 (D. Conn. Jan. 20, 2012) ("To demonstrate prejudice [plaintiff] must show that the additional medical  reports would undermine the ALJ's decision." (citation and quotation marks omitted)).   Plaintiff simply has not met that burden.  Therefore, the ALJ did not err by failing to request additional opinions about plaintiff's physical impairments.

**b. The RFC Determination**

Next, the Court considers plaintiff's several arguments related to the RFC determination. Plaintiff argues that the ALJ's RFC is not supported by substantial evidence. Specifically, plaintiff argues that the ALJ improperly weighed the available medical evidence and failed to incorporate limitations related to off-task behavior, absenteeism, supervisor interaction and exertional limitations. The Court finds that the ALJ properly weighed the opinion evidence and that the record does not support any additional limitations.

### 1. *Weighing of Opinion Evidence*

Plaintiff argues that the ALJ erred in not assigning more weight to the medical source statement completed by Dr. Camacho Pantoja, plaintiff's treating psychiatrist, on May 31, 2018. (Doc. No. 18-1, at 7; R. 503-505). Plaintiff also argues that the ALJ should have given more weight to the Mental Impairment Questionnaire completed by Dr. Melendez, plaintiff's primary care provider, on May 3, 2017. (Doc. No. 18-1, at 9; R. 663-668). The Court finds no error in the ALJ's weighing of opinion evidence.

The Social Security Regulations define the RFC as "the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts … and nonmedical evidence[.]" Social Security Ruling ("SSR") 96-8P, 1996 WL 374184, at *7 (S.S.A. July 2, 1996); (*see Cobb v. Astrue*, 613 F. Supp. 2d 253, 258 (D. Conn. 2009)). The RFC determination necessarily involves the ALJ evaluating the opinions of the various medical professionals that treated a claimant. *Warrick v. Saul*, No. 3:19-cv-674(SALM), 2020 WL 2537459, at *6 (D. Conn. May 19, 2020). With regard to the nature and severity of a claimant's impairments, "[t]he SSA recognizes a treating physician rule of deference to the views of the physician who has engaged in the primary treatment of the

12

claimant." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations and quotations omitted). When evaluating a treating source's opinion on the nature or severity of a claimant's impairments, the treating source's opinion will be given controlling weight when it is well-supported by, and consistent with, other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(c)(2).  The opinion, however, cannot be given controlling weight if it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques[.]" 20 C.F.R. § 416.927(c)(2).

When a treating physician's opinion is not controlling, the ALJ must consider several factors in determining how much weight it should receive. *See Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015); *see also Burgess*, 537 F.3d at 129. Those factors include "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013); *see* 20 C.F.R. § 404.1527(c)(2).

In evaluating the consistency of a medical opinion, "[t]he Second Circuit has repeatedly held that an ALJ may give a treating source's medical opinion less weight where it contradicts their own treatment notes." *Negron v. Colvin*, No. 15CV2515(ADS)(AKT), 2017 WL 1194470, at *7 (E.D.N.Y. March 31, 2017).

A treating physician's opinion given on a check-the-box form is often not helpful in discerning the physician's opinion. *Latham v. Colvin*, 2016 WL 6067848, at *4 (W.D.N.Y. 2016) (The court found the ALJ did not err in disregarding a "'check-box' form, which included no supplementary explanation or supporting evidence"). "[T]he Second Circuit has consistently held

that opinions rendered on 'check-box' forms are often the ones entitled to little meaningful insight into the basis for the clinician's findings." *Id.*

After considering these factors, the ALJ is required to "comprehensively set forth [her] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004). In so doing, the ALJ must provide "good reasons" for the weight assigned. *Burgess*, 537 F.3d at 129. However, an ALJ is not required to "slavish[ly] recite[ ] each and every factor where the ALJ's reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013). The ALJ is also not required to have the RFC "perfectly correspond with any of the opinions of medical sources." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013). Rather, an ALJ is "entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole." *Id.*

On May 31, 2018, Dr. Camacho Pantoja completed a Mental Residual Functional Capacity Assessment (hereinafter, "Camacho RFC"). (R. 503). The Camacho RFC opined that plaintiff was "moderately limited" in her ability to "understand and remember detailed instructions;" "carry out detailed instructions;" "maintain attention and concentration for extended periods;" and "ability to travel to unfamiliar places or use public transportation."  (R. 503-505). All of this information was provided on a standard form consisting of various checkboxes. (Id.). On the final page of the Camacho RFC, the form calls for a narrative explanation that clarifies the limitations or functions that were previously checked off. (R. 505) Dr. Camacho Pantoja did not complete this portion of the form and left the query unanswered. (Id.).

The ALJ assigned little weight to the Camacho RFC because:

the report shows largely minimal limitations except in the area of the claimant's ability to perform full time work and traveling to unfamiliar places, which showed marked

14

limitations. Here, the report is a check-the-box format with no explanation for the assessed limitations. Further, the assessed limitations are completely contrary to the records in the file showing an overall improvement with treatment of medications alone.

(R. 29). Plaintiff contends that the ALJ improperly assigned "little weight" to the Camacho RFC and this resulted in an unsupported RFC description. Doc. No. 18-1, at 9. Defendant responds by arguing that the ALJ was entitled to discredit the Camacho RFC because it was not consistent with the medical record.

Here, the ALJ gave appropriate weight to the Camacho RFC because it was partially inconsistent with other evidence in the record. "An ALJ may assign less than controlling weight to a treating physician's opinion where that opinion is contradicted by other substantial evidence in the record." *Gonzalez v. Berryhill,* No. 3:17CV01385(SALM), 2018 WL 3956495, at *10 (D. Conn. Aug 17, 2018).  First, Dr. Camacho Pantoja assessed plaintiff as "markedly limited" in her ability to travel to unfamiliar places. (R. 504). This assessment is contradicted by the fact that in the year prior to the Camacho RFC, plaintiff traveled to Canada. (R. 504, 507). Dr. Camacho Pantoja was aware plaintiff was travelling to Canada and included said travel in her treatment notes which were completed prior to assessing plaintiff's residual functional capacity. (R. 532).

Next, the Camacho RFC is inconsistent with other substantial evidence in the record. Dr. Camacho Pantoja assessed plaintiff as moderately limited in her ability to concentrate and remember and follow detailed instructions. (R. 503-505). Dr. Camacho Pantoja's assessed limitations however, are contradictory to other medical opinion evidence which note plaintiff as "cooperative," having "intact" cognition, proper short-term memory, capable of following instruction and "insightful, attentive, and focused." (R. 440, 445, 450, 563).  Dr. Camacho Pantoja's notes indicate that plaintiff's condition improved with treatment. (*See* Ex. 10F). On August 4, 2017, Dr. Camacho Pantoja noted that patient was "calm and reported that she was

feeling better (calmer) and sleeping well." (R. 515). Again on November 9, 2017, Dr. Camacho

Pantoja's treatment notes indicated that plaintiff is "pleasant and reported feeling better." (R.

532).

      More weight will be given to a medical opinion that is consistent with the entire medical

record. 20 C.F.R. § 416.927(c)(4). Here, the ALJ properly weighed the Camacho RFC because it

contradicted with other substantial evidence in the record. *See Wavercak v. Astrue*, 420 F. App'x

91, 93 (2d Cir. 2011).

      Furthermore, the ALJ appropriately attributed "little weight" to the Camacho RFC

because it consists entirely of checkboxes, and at no point does Dr. Camacho Pantoja provide

further explanation on plaintiff's functional limitations. The Second Circuit has previously found

that checkbox assessments are "only marginally useful for purposes of creating a meaningful and

reviewable factual record." *Halloran*, 362 F.3d 31 n.2. "The better an explanation a source

provides for a medical opinion, the more weight [the Commissioner] will give that medical

opinion." 20 C.F.R. § 416.927(c)(3). Dr. Camacho Pantoja's opinion was made on a check-the-

box form and lacked any additional explanations for his assessment. The Camacho RFC did not

provide the ALJ with meaningful insight into the reasoning for plaintiff's functional limitations

and did not provide a substantial explanation for any of Dr. Camacho Pantoja's assessments.

      Although the Camacho RFC was given "little weight," it was still considered as a part of

the entire medical record as explained above in Section IV(a) of this ruling.  Any conflict

between the Camacho RFC and the other medical evidence was left for the ALJ to settle. It is the

function of the ALJ, not the reviewing court, to "resolve evidentiary conflicts and appraise the

credibility of the witness, including the claimant." *Carroll v. Sec'y. of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

Plaintiff also argues that the ALJ erred in only assigning little weight to the Mental Impairment Questionnaire completed by Dr. Melendez, plaintiff's primary care provider, on May 3, 2017. (R. 29, 663-668). On the questionnaire, Dr. Melendez assessed plaintiff as below average in her ability to get along with others without distracting them, to perform tasks at a reasonable pace and to perform tasks "without interruption from psychological symptoms." (R. 667). Plaintiff was also considered below average in her ability to focus long enough to "finish simple activities or tasks." (R. 667). Dr. Melendez explained that plaintiff had "[d]ifficulty concentrating [and] focusing due to depression [and] crying spells." (R. 667). Dr. Melendez also noted that plaintiff "[c]annot concentrate well due to depression. Frequent crying spells [and] poor sleep [sic]." (R. 667). The ALJ did not err in assigning little weight to Dr. Melendez's Mental Impairment Questionnaire because it was only based on plaintiff's condition up to April 28, 2017. (R. 663-68). Following the completion of this questionnaire, the record indicates an improvement in plaintiff's condition. For example, Dr. Camacho Pantoja's treatment notes show improvement with medication (R. 461, 503-05, 515, 518, 532, 538, 543, 548, 558); plaintiff's physical therapy treatment notes showed positive progress (R. 747-764); and plaintiff's international travel and visits to walk-in clinics while abroad indicate improvement in her overall condition (R. 507, 510-11, 532, 543). Additionally, it was appropriate for the ALJ to discount Dr. Melendez's opinions on plaintiff's mental health because Dr. Melendez is not a mental health

specialist, but rather plaintiff's primary care provider and does not have particularized knowledge in the area of mental health.

For the reasons stated above, the ALJ properly weighed the mental impairment questionnaire completed by Dr. Melendez and the RFC assessment by Dr. Camacho Pantoja. Therefore, the Court finds that the ALJ did not err in her weighing of opinion evidence.

### 2.    *Additional Limitations*

Finally, plaintiff argues that the ALJ erred in not including all relevant factors from the record into the RFC determination. Specifically, plaintiff argues that the ALJ should have incorporated the following limitations: (1) plaintiff will occasionally be off-task and absent from work; (2) plaintiff will be limited in her ability to interact with supervisors and accept instruction and (3) plaintiff will have fatigue and related exertional limitations. Doc. No. 18-1, at 11-14.

In terms of off-task behavior and absenteeism, plaintiff avers that the ALJ erred in weighing opinion evidence provided by Dr. Camacho Pantoja and Dr. Melendez. As noted above, the Court finds that the ALJ properly weighed Dr. Camacho Pantoja's medical source statement and Dr. Melendez's mental impairment questionnaire. Thus, the Court does not find plaintiff's argument for this limitation persuasive and finds that the ALJ did not err in excluding it from the RFC determination.

Next, plaintiff argues for a limitation in her ability to interact with supervisors by citing to Dr. Lago's consultative examination. Dr. Lago indicated on his consultative examination that plaintiff may have difficulty interacting with coworkers and supervisors. (R. 451). The ALJ appropriately considered Dr. Lago's opinion which also included that "with continued anti-depressant treatment, her condition should improve." (R. 451). The consultative examination was completed on April 27, 2017, and the evidence in the record following that date indicates that plaintiff did continue her anti-depressant treatment, and that the treatment did yield an

improvement in her condition. (R. 448, 515, 518, 532, 538, 543, 548). Separate from Dr. Lago's consultative examination, the record also includes a questionnaire for Activities of Daily Living which plaintiff indicated herself that she gets along "relatively well" with authority figures (R. 386). Accordingly, there is sufficient evidence to support the ALJ's exclusion of such a limitation.

The ALJ acknowledged plaintiff's limitations in interacting with others by limiting plaintiff to only occasional interaction with coworkers and no group work. (R. 26-28). Plaintiff has failed to show why a further limitation in social interaction is warranted. The record supports the social interaction limitation that the ALJ has already included in the RFC and thus the Court finds that the ALJ did not err by excluding further limitations.

Plaintiff also argues that an exertional or fatigue-related limitation is warranted based on her physical impairments related to her hip pain and anal pain. The record includes evidence to the contrary. Plaintiff self-reported on a questionnaire that she could walk for two miles, take a ten-minute break, and then continue walking. (R. 386). Additionally, physical therapy notes from Allison Schwartz, plaintiff's physical therapist, indicate an overall improvement in plaintiff's physical condition. (R. 747-64). Specifically, Ms. Schwartz noted that plaintiff improved in her ability to sit for prolonged periods of time and that plaintiff could continue to perform her at-home exercise program on her own. (R. 762-763). Since treatment has improved plaintiff's

physical condition the Court finds that the ALJ did not err in excluding physical limitations from the RFC.

Plaintiff's arguments for additional RFC limitations are not supported by the record. The Court finds that the RFC crafted by the ALJ is supported by substantial evidence and thus finds that the ALJ did not err in excluding the additional limitations that plaintiff seeks in this action.

## V. <u>CONCLUSION</u>

For the reasons set forth above, the Court orders that plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 18) be **DENIED**, and defendant's Motion to Affirm the Decision of the Commissioner (Doc. No. 21) be **GRANTED**.

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the District Court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. §636(c)(3); Fed. R. Civ. P. 73(c).

SO ORDERED, this 23rd day of September 2021 at Bridgeport, Connecticut.

*/s/ S. Dave Vatti*
S. DAVE VATTI
United States Magistrate Judge
